of the burden of proof, then my colleague will talk about the substantial evidence issues. This Court has held that IJs and the BIA are not entitled to state the correct legal standard, but then actually apply an incorrect standard. Yet that is exactly what the IJ did here. It began by reciting the correct standard, just reading its words, it is the burden of the DHS to show that the respondent could have reasonably relocated to another part of Guatemala to avoid further persecution or attempts on her life. But then in its actual applications, the IJ shifted the burden to Ms. Ixcoy. And the IJ did that in the initial part of its application that focused on the first prong of the relocation analysis, whether Ms. Ixcoy could safely relocate to avoid future persecution, as opposed to the second prong, which considers a broader range of general reasonableness factors. So the IJ — Isn't the record pretty clear that, regardless of what words the IJ may or may not have used, I realize the technical word bothers you, but at the end of the day, the record seems pretty obvious that relocation was possible. She actually did relocate. Or she had that time — I'm trying to remember the specific — she had that time away where nothing happened for six months or — My colleague will go into this in more detail, but a two-month period of hiding cloistered in her parents' home — It wasn't hiding. She was talking to her sister-in-law constantly. She took phone calls from her sister-in-law, that's true. But she did remain inside her parents' home, didn't leave that home without either her father or her brother as an escort. And then even during that brief time, she at least received a death-threat phone call. But I want to be careful here, because there is a — we have strong substantial evidence arguments, but that is our second argument. Our first argument is about this independent legal requirement that even if there could be substantial evidence on this record to support an adverse finding, the IJ had to actually make that adverse finding on the correct standard. And if you look at the — Yeah, go through the IJ's opinion and pinpoint where the burden was, you say, shifted. As opposed to just analysis of the evidence. I understand. I'm focusing on these three paragraphs of the IJ's opinion. These are on pages 135 and 136 of the record, and I'm not just picking these out of the air. This is the entirety of the IJ's analysis of that first prong about relocation to avoid future harm from the people that hunted her down the first time around. So if you look at those three paragraphs, the first of those paragraphs just goes through the evidence. There's not really much actual analysis. I think that really begins in the second paragraph. In the opening sentence, the Respondent has not presented any information that her sister-in-law is still attempting to harm her. Well, it's not her burden to do so. The Respondent — Why is that — I don't understand that argument. That is just a factual statement that the Respondent hasn't presented information. That could be a shifting of the burden or it could not be a shifting of the burden. Two paragraphs earlier, we know quite clearly that the IJ is not shifting the burden. Your Honor, I think that — You see what I'm saying? It's just describing the fact that she didn't provide evidence. Our position is not that an IJ opinion couldn't have statements like this saying that the Respondent hasn't presented any evidence or any hard evidence or that her testimony does not provide evidence for the opposite proposition. An IJ could write an opinion like this, but how that opinion would go is that, first, the IJ would have to provide — frame its analysis, focus on the evidence around, did the government show that she could be safe? And after the IJ does that, sure. Then the IJ could say, okay, well, I think that's enough for the government to meet its burden. Let's see what Ms. Iskoy has presented on the other side. But here, the IJ skipped over that first part entirely. And if I could go at this from a slightly different angle, that I think will perhaps make my point more clearly. If the Court will just pretend for a moment that you haven't read the briefs, you don't know anything about this case, and I give you those three paragraphs, not where the IJ re-cites the standard, but just those three paragraphs where it analyzes and makes sure that the IJ does not present evidence of this or that. Then I ask you, who bore the burden? If you would say, Ms. — I guess you could say it's not the best written opinion, right, that a better act of judicial opinion writing would start with what does the government say and then go to the rebuttal. I'm just not sure that's an actionable violation that warrants vacate or reversal. If the natural reading of the immigration judge's application is that Ms. Iskoy bore the burden, and again, I think the best way of doing that is simply — Let me presuppose a world in which the IJ just thought, look, it's obvious. She had this time away. She was in contact with everybody. Yes, she was in their home, but that's not a big deal. That's all just assumed as part of the factual rendition. In fact, I think there is a factual rendition somewhere here. Yes, Your Honor. Right? So that's just in the background. And so, yes, when the IJ turns to the asylum section, that's all already given. It's already in the opinion. We're just explaining that on top — you know, that's all obvious, and the Respondent didn't offer anything to rebut that. But even if — and again, let's just assume for the sake of argument that there could be substantial evidence. My colleague is going to focus on that. But even if that were the case and even if all of that evidence were in the record, which I agree that there is a long factual recitation that, frankly, doesn't really line up well with the analysis, because the factual recitation talks about how bad it was for Ms. Hiscoy, and then the analysis seems to have flipped on its head. But putting all that aside, if we're going to review how the immigration judge applied the burden, I don't know how else you can do that other than looking at how the immigration judge framed the evidence, what questions the immigration judge has asked. That's what — we review the IJ and the BIA in terms of what they said. And when they didn't miss — they didn't affirmatively misplace the burden, we look at what they said. There's also a regulation that they are to consider the totality of the circumstances regarding an applicant's prospects for relocation. So, you know, a factual recitation can be analyzed in terms of the totality of the circumstances. I agree with Your Honor that there's a broad range of factors that are relevant to the general — the general internal relocation prong. In a case like this where you have a specific person who has hunted her or a, I guess, group of people, it's I think a little bit the universe of circumstances are more constrained. But that's really getting off topic because my main point is that regardless of what the evidence is, you have to look at how the immigration judge used the — can I finish my sentence, Your Honor? Thank you, Your Honor. You have to look at how the immigration judge used that — how the immigration judge framed the evidence, looked at the evidence, and we've cited five cases from other circuits in our reply brief that go through this same analysis on immigration judge opinions that are more or less the same here and have found that it improperly shifted the burden. Thank you. All right. Thank you. Okay. Mr. Werfel. As my colleague has explained, I'll be discussing why the IJ's internal relocation finding is not supported by substantial evidence. And that is because the IJ's finding that the DHS met its burden that Ms. Coy could safely relocate within Guatemala rests on a few broad categories of so-called evidence that is not actually evidence. The first of those is that Ms. Acecoy could hide from her sister-in-law. The second is that Ms. Acecoy's sister-in-law may have lost interest in killing her. And the third is that Ms. Acecoy is well-educated, speaks Spanish, and has previously been able to find employment. But as this Court — A lawyer. She's not just well-educated. She is a lawyer, right? She was attending law school, yes. And I think — well, and she was having an executive position. But then when she talked to the police about this alleged threat, she didn't even mention her fear about her sister, right? She never did come clean with the police about what she was going to do. As the IJ found the sister-in-law was — in his next finding, the sister-in-law was behind a death threat. That's not the issue before the Court today. The issue is whether — Well, I'm saying there's very little good for him. He was being very, very generous in regard to that. There's a — There's a significant amount of evidence supporting Ms. Acecoy's sister-in-law's attempted murder of her, including a large pattern of discrimination and attempts to — Well, they were nasty, yeah. But nasty doesn't mean you're going to murder them. Including, as — if you look at the record on page — on 694, you can see that her sister-in-law and her sister-in-law's brother's associates were stalking her and her mother leading up to the murder. But again, Your Honor, that is not the issue before the Court today. The issue is whether substantial evidence supports the relocation finding of the IJ. And as the Court held in Singh v. Sessions, that 60-day period in which Ms. Acecoy was living with her parents cannot support that internal relocation finding. And that is one of the key elements that the IJ relied upon. Is she living with her husband in the U.S. now? Yes. She is currently living in Florida with her husband. And while she was living with her parent — as this Court held in Singh v. Sessions, those periods of brief living in hiding cannot constitute substantial evidence that an asylum applicant would be able to relocate in the future, just as they cannot constitute evidence of their ability to relocate in the past. But this isn't the typical case of that sort, because when people are in hiding in those other cases, they're really in hiding. And then they say, oh, the hiding, whoever it is, is making inquiries, and they know they're going to find me, and then they're going to do something to me. In this case, the allegedly murderous sister-in-law knew exactly where she was. Yes, and Ms. Acecoy's ability to hide from her sister-in-law. But there was no stalking. Ms. Acecoy remained in her home during these 60 days, and as you can view in the record, on page 437 from her testimony and 701 through 704 from her affidavit, she never went out of the house by herself. And every time she went to the doctor for her injuries from the attempted murder or to the public ministry to try to attempt to continue her investigation, she was accompanied by either her brother or her father. And she was forced to quit her law school education and remain inside so that she wouldn't be able, so she wouldn't go out and be harmed again. She also changed her phone number after receiving a death threat. But there's also information that is referred to in the opinion that the authorities did, in fact, do an investigation when she was, I mean, this is what's inconsistent to me about the opinion. Persecution has to be, you know, the government has to be involved in allowing this kind of thing to happen, and yet the authorities did do an investigation, including forensic investigation, and they were deprived of the most important lead. Well, Your Honor, the investigation that the authorities conducted was simply looking at the car for bullet holes after the police refused to send a car after Ms. Exployer originally filed a report. And the most the police actually did was call the prosecutor's office, who were the ones who actually sent the car. And you can see that on page 700 of the report. I hate to see crimes go unprosecuted in the U.S. all the time right now, and I don't know whether people could go to Guatemala and claim asylum from the U.S. under comparable circumstances. But the authorities were not mute and did not tell her to go away, and there were no allegations. They were bribed. They may have not have done a good job, but they did something. Even then, Your Honor, the response of the authorities where Ms. Exployer lived has no relocation prong. That is a separate consideration that the IJ specifically decided not to consider. And one of the other factors that underlied the IJ's considerations was his speculation about the sister-in-law's motives, whether she was still attempting to kill Ms. Exployer. And as you mentioned, the sister-in-law was still calling her. Those calls were an effort to find out what the police report said, what Ms. Exployer had reported. Isn't the fact, counsel, respectfully, that we're having this dialogue about the evidence one side or the other, doesn't that inescapably lead to the conclusion that substantial evidence standard is not met because the opposite conclusion is not compelled? Your Honor, there is no evidence that Ms. Exployer would be able to safely relocate. And if I may finish answering your question, there is no evidence that Ms. Exployer would be able to safely relocate. The three items of evidence that I discussed are the only items of evidence that the IJ pointed to that the DHS provided as evidence she would be able to safely relocate, two of which are disclosed by seeing versus sessions as court's own precedent, and one of which is a mischaracterization of the evidence of the sister-in-law's motivation for calling, which on the record at 427, you can see the actual quote of what Ms. Exployer's sister-in-law provided, or what Ms. Exployer testified her sister-in-law said, which is where they would say they were sorry, they would ask a lot about the investigation, how things were going with the police office, they were asking all the questions about the police report, they wanted to know about the report, and they even, I think, they wanted to ask to see the report. There is no expression of regret or remorse. Thank you, Your Honors. Okay. Thank you. You have a little opportunity. All right. Mr. Rabin. Good morning. May it please the Court, Arthur Rabin on behalf of the Respondent at the Attorney General. Now, as Judge Wilson pointed out, the standard here is whether or not substantial evidence supports the agency's finding, and whether or not a petitioner can show something so compelling as to overturn it. Now, in this case, we submit that substantial evidence does support the agency's finding that the government was able to rebut the showing of past persecution, that is, to show that Ms. Exployer could relocate within her home country of Guatemala, and it would be reasonable to do so. Now, first turning to the initial issue of shifting the burden, with the Court's permission, because the immigration judges found past persecution by law, by regulation, the burden then shifts to the government to rebut that past persecution finding, and we submit that they did that, and they did that because the, I mean, it's not determinative, but obviously both agencies' decisions set out the correct standard, and then they proceeded to apply that standard. Now, counsel for petitioner makes a lot of pay out of a single sentence in the immigration judge's decision, and that is on page 135, where the immigration judge had stated the Respondent has not presented any information that her petitioner is still attempting to harm her. Yet, if we look at that out of context, out of, if we completely omit everything else that follows, that would appear to be problematic. But if you actually look at it, and you notice that it is merely a description of the state of the evidence, it is an assessment of the state of the evidence. It is not a shifting of the burden. What the immigration judge was trying to do was say, here's what the evidence looks like, and it looks like there is nothing on page 135 that is a shifting of the burden, including the very last sentence of that paragraph that says the record is devoid of any reason to believe that if the Respondent returned to, it should say, Guatemala, her sister-in-law would continue to attempt to harm her. Again, this is a case, as Judge Jones pointed out, where this is not, the persecutor is not the government. The persecutor is not a large organization, such as a gang or a group of individuals. So what the judge was trying to say is, if that's the entire claim, that's the entire, and we don't even know if that's true, because, again, this is only her suspicion that her sister-in-law were actually involved in any of this. She had no hard proof of any of this, and that was part of the judge's analysis, that it was only her sister-in-law, supposedly, that was prejudiced against her so much that she would actually hire a hitman to get rid of her sister-in-law, who she believed was insufficiently worthy to be married to her brother. However, here, it's only one individual, or two. And so the judge was trying to look at all the evidence of how, what is the relationship between these two sister-in-laws. And that's where he was talking about that even after the incident, the sister-in-law was calling her, and the petitioner paints it in the worst possible light, that is, well, she's just looking for, fishing for evidence or information about the evidence of what the police have found. And the judge said, no, that could also be interpreted as a sister-in-law who's actually concerned about what happened and is trying to figure out that maybe she regretted what happened and is passing on her regrets. In, you know, to look at this Court's case law as Petitioners' Counsel did, which is they referred to a 2018 case of Singh v. Sessions, and we would point the Court to Singh v. Barr that was issued and published by this Court a year later. And in that case, on the issue of shifting the burden, this Court held that DHS's reliance on cross-examination, although not voluminous, can sustain DHS's burden of proof as long as the testimony is legally sufficient. The Court continued, the argument that DHS must affirmatively submit its own documentary evidence or summon its own witnesses is belied by the Texas regulation, which simply requires DHS to rebut the presumption by a preponderance of the evidence, not by its own evidence. And that's what happened in this case, Your Honors. You know, even though counsel relies on Singh v. Sessions, that case is inappropriate because here the government did actually put forward its own affirmative evidence. It did actually cross-examine Petitioners' Counsel, or Petitioner herself, on the issue of relocation. So this is not a barren record as it was in Singh v. Sessions. Instead, what we have here— Your point is, in the paragraphs following the burden— That's correct, Your Honor. When you talk about the Respondent, this is really actually a discussion of the government's cross-examination of the Respondent, and that's the government's effort to rebut. That's correct, Your Honor, yes. Because, yes, the government had to show that this Petitioner is no longer facing a well-founded fear. And that's why, in the judge's decision, he continues to go into all the elements of that claim. And that's part of what he had to do in order to show, under the totality of the circumstances, that she was no longer facing a — she no longer had a well-founded fear. So in this particular case, if we actually look at what the safe relocation finding was, substantial record evidence does support that, because even though Petitioner supposedly feared her sister-in-law, when she did relocate for at least 60 days to her parents' house, there was no more attempts on her life, and even though she testified that her sister knew where she lived. Now, admittedly, 60 days is not a very long time. But still, if that was what her sister-in-law was intended on doing, and that was her opportunity to do that, she could have taken that opportunity. But we do know, at least based on this record, she was able — she was successfully able to relocate. She also, we know — They say she was in hiding. She was not really in hiding, Your Honor. She had traveled to see the police in the town where this incident happened. She went to see the doctor in the town where this all happened. She traveled to the Capitol to obtain a visa to the United States, and only when that visa was denied did she actually leave Guatemala to rejoin her husband. So we do know that, based on these facts, she wasn't in hiding. Was she accompanied by a relative? Yes. Was she maybe fearful? Probably. But who did she know to be fearful of? Well, she says it's her sister. Well, the police were never told that. She claimed that she went to the police, and the police were of no help to her. Well, that's interesting, because she curiously omitted the very suspect that she supposedly was trying to kill her from her police complaint. She never told the police that she suspects that it was her sister-in-law who was trying to kill her, or at least engineer the assassination. What she did provide the police is the most generic description possible. That is, it was a man wearing a black helmet, wearing a black T-shirt, on a black motorcycle. That's it. Well, given that, it's no wonder the police made no progress on that investigation. They were able to go out and do a crime scene sketch, take photos, take her statement, basically refer her case to the prosecutor's office. But given the dearth of evidence here, and given her withholding of critical evidence, it's no wonder the police were not able to shed any light on the shooting that took place. Moreover, she changed her phone number and never told the police. Apparently, during the time she was hiding with her parents, she received a phone call. And as so often happens when a case is publicized, and apparently on this record it shows that her phone number was somehow disclosed, and somebody made a phone call to her for an extortion attempt, claiming that they knew her husband was in the United States, thus, therefore, sending money to her. And they wanted money or they would kill her. She was not able to show any linkage between the shooting attempt and the threatening phone call. So we don't even know if those are connected, given the state of the evidence here. What we do know is that after that phone call, she changed her phone number. So the police could not even contact her. So to say that the authorities were somehow unhelpful to her or didn't protect her, that would be a mischaracterization of this record. Now, lastly, part of the relocation problem is the reasonableness of the relocation. And what the judge looked at was, in this particular case, yes, she is an indigenous woman. Yes, her husband is away. However, for years while he was away, she was able to work numerous jobs in the private sector as well as the public sector for the Ministry of Health. She was able to get promotions. She was able to obtain an education. She graduated post-high school with a degree in accounting. She had completed at least four that I know of, maybe even all of it, for her law degree, four semesters. So she was able to go around and deal with non-indigenous people because she was in a town exclusively populated or mostly populated by Latinos. The opinion keeps referring to Ladinos. Yes, Your Honor. Is that a misspelling or what? I don't know if that's a Guatemala-specific term, Your Honor. I have no expert in that term. Just wondered. Yes, I don't know. But basically what the judge looked at was the reasonableness of the relocation, that is, whether or not she could move to an indigenous-only town or even a Ladino-majority town. And he found that she could, given that she spoke fluent Spanish, had a high degree of education, was able to hold a number of jobs and was able to support herself, including buy her own car and live on her own. So in either of those two communities, the judge found it would be reasonable, especially given that it's only one or two people who are supposedly looking for her. It's not an organization. It is not a countrywide authorities that would have the resources and the motive, actually, to go after her. There's none of that here. So in conclusion, Your Honors, I think that what the stated evidence in the final analysis shows is that this petition for review should be denied because substantial evidence does show that the government was able to rebut the past persecution finding. And the petitioners have shown nothing that would compel a contrary conclusion. Okay. Thank you, sir. Thank you, Your Honor. Mr. Little, rebuttal. Three broad points, Your Honor. First, just to be very clear, the IJ found past persecution. It accredited Ms. Ispoy's version of events. I won't go through and read the opinion, but on page 134 of the record, I think that's clear. I don't think the government has taken the opposite position, but I just want to be loosely clear on that. Second, the government referred to one sentence of the IJ's opinion. Our argument isn't that there's one stray sentence. It's that there's this three-paragraph part of it. The first paragraph merely recites evidence. The second and third paragraphs have the actual application. If you look at the opening paragraph, if you look at the opening sentence and the concluding sentence, those both ask whether Ms. Ispoy could show that she wouldn't suffer harm, when I think everyone agrees that the question is whether the government could show that she would not. Even at one point it says Ms. Ispoy hasn't been able to provide any hard evidence. Again, it's not that an IJ cannot say those things, but when the entirety of its application focuses on what the asylum applicant has not shown, and I guess more importantly has not shown the opposite of the presumption that the government bears, that's an indication that this isn't the usual way presumptions are working, something went wrong. Lastly, to take the end, I guess one more point on that, if you look at pages 4 and 5 of our reply brief, we cite cases from other circuits that have encountered IJ opinions much like this and held, yeah, it looks like the IJ has shifted the burden in the application. We are going to remand, ask the IJ to apply the presumption. This one was remanded once. It was, Your Honor. And I forget, I can't find it in my bench book here. Why was it remanded the first time? The IJ ruled for Ms. Ispoy in the first round. The BIA remanded. As I'm standing here, I can't tell you why. I can tell you that it wasn't, that remand isn't tied up in the issues here. It wasn't on relocation? It might have had something to do with the relocation, but it wasn't a look at the evidence through this lens or that type of thing. I apologize for not having that in my book. I thought it was focused on the relocation issue and the fact that the IJ had not adequately considered that possibility before granting the asylum. Your Honor is right. Part of the remand, thank you for that reminder, part of the remand did ask the IJ to consider certain evidence. As it comes here, these are all legal issues that this Court reviews de novo, so whether the BIA got that wrong, whether the IJ got it wrong, whoever got it wrong. All I meant by that, thank you, Judge Wilson, all I meant by that was that on remand you would think that the IJ would be particularly conscious of the standard of the burden of proof and what he had to do to fortify the record at that point. If I could briefly turn to the substantial evidence issues. I think there are two broad pieces of evidence, and neither are affirmative evidence that the government needs to overcome the presumption that Ms. Esquoy would not be safe. First is this two-month period of living with her parents. We've talked about whether that's hiding or not. We obviously think it is, but I don't think it's worth belaboring that point more. What I do want to hit is that even if it's not hiding, two months isn't enough. The Ortiz-Cruz case out of the Fourth Circuit looks at that. They say periods of a few months, I think it was eight months there, isn't enough. Our briefing has cases that also have much longer periods that aren't enough. But even if it's not hiding, just the pure length alone is an independent issue. The second is this phone call that the IJ says, you know, could have expressed regret. And I want to show the Court the exact record evidence on this, because there is no way to read this as the citizen saying I'm, you know, sorry that I tried to kill you. Here's what that is. On record, page of the record 427, the IJ is questioning Ms. Iscoy, says, why do you think that your sister's in-law were trying to trick you into thinking that they weren't involved? She says, they would talk to me. They would say they were sorry. They would ask me a lot about how the investigation was going with the police office. They were asking me all the questions, but the police report, they wanted to know about the report. They even, I think they asked me to see the report. This was, I'm sorry you got shot. Tell me about that police report. Why did her brother-in-law take her to the police station then? To get help from the police, Your Honor? Well, he's trying to, if he's involved in the attempt to kill her, I'm just wondering about that. No, Your Honor. Ms. Iscoy has never alleged that her brother-in-law was involved. It's all the evil sister. There are two sisters-in-law, and there are also two ex-girlfriends of her husband, and again, the IJ credited all of that. I see. Thank you, Your Honor. Okay, thank you very much. Do you want to take a break now or after the third case? What do you want to do? Take a break now. Huh?